those two states strictly forbid the punitive damages sought by PowerTech. Attwood timely raised this issue by filing a motion *before judgment* demonstrating that PowerTech failed to state a claim for punitive damages. Because the claim is absolutely barred, no change in evidence or jury instructions could have saved it. Attwood also preserved this argument by moving for judgment as a matter of law pre-verdict. And even if the argument were not preserved, it is plain error to award punitive damages where no claim for such relief can be stated. Even under Texas law, moreover, the punitive damages are not warranted by the evidence and are disproportionate to PowerTech's *actual* damages.

*Sixth*, if the Court does not direct entry of judgment for Attwood on all claims, Attwood is entitled to a new trial. The verdict is *both* against the weight of the evidence *and* attributable to PowerTech's pervasive appeals to passion and prejudice. These grounds for a new trial reinforce each other here. As in similar cases, the Court should carefully assess the cumulative effect of the evidentiary deficiencies and misconduct of counsel in the context of the entire record when ruling on Attwood's new trial motion.

In rejecting these authorities, the district court cited this Court's decision in *Chemical Distributors, Inc. v. Exxon Corp.*, 1 F.3d 1478 (5th Cir. 1993), which allowed lost profits damages for two years after a notice period ended. In *Chemical*, however, this Court expressly observed that the damages could have been based on destruction of the plaintiffs' business under an unfair competition theory governed by Louisiana law, rather than on breach of contract through short notice. *Id.* at 1485-86. Tellingly, the district court itself doubted whether *Chemical* "is the Fifth Circuit's final word on future lost profits damages resulting from breach of a contract's notice requirements." R. 15.

Moreover, assuming *arguendo* that PowerTech could obtain lost profits after the notice period *if* they were caused by Attwood's breach, there was no showing of that here. PowerTech's expert Cummings admitted that he altogether failed to investigate or rule out the most obvious alternative explanation for any decline in PowerTech's profits: competition. Tr. 579:13-589:20; *see* Tr. 484:25-486:2 (admission by Cummings that competition caused decline in PowerTech's sale *before* arrangement with Attwood). Failure to consider obvious alternative explanations for alleged lost profits defeats any attempt to prove that they were caused by Attwood's breach. *See, e.g., Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056-57 (8th Cir. 2000). Cummings also admitted that no

professional literature or test supported his assumption of a 20% growth rate in the absence of termination by Attwood, and that he "made that up as [he] was doing the work." Tr. 568:8-570:15 (R.E. Tab 23).

Finally, Cummings did not identify specific customers PowerTech purportedly lost, and he asserted that the amount of damages need *not* be shown with reasonable certainty. Tr. 473:12-17, 474:13-16 (R.E. Tab 23). The law is to the contrary. "[W]hen lost profits are dependent on a plaintiff's lost contracts with customers, Texas law requires that such contracts be proved with reasonable certainty, both as to their existence and their number." *Great Pines Water Co. v. Liqui-Box Corp.*, 203 F.3d 920, 922-23 (5th Cir. 2000); *id.* at 922 ("the amount of the loss must be shown . . . with reasonable certainty").

In sum, the maximum damages supported by evidence are $24,646 in cover and $5,875 in warranty claims, totaling $30,521. PowerTech failed to establish that any of its other claimed damages flowed from Attwood's cessation of supply during the 12-month notice period. PowerTech "had a full opportunity to establish its claim for lost profits and consequential damages; . . . having failed to do so, it may not retry its claim for these damages." *Great Pines*, 203 F.3d at 925.

## IV. PowerTech's Trade Secrets Claim Is Unsupported by Evidence.

PowerTech used its trade secrets claim to insinuate, again and again, that Attwood engaged in wrongdoing. But the actual evidence did not support its trade secrets claim. This issue is reviewed under the sufficiency of the evidence standard. *Supra* at 36-37.

Throughout trial, PowerTech created an atmosphere of wrongful conduct by implying that Attwood stole PowerTech's designs for tools, propellers, or both. Tr. 85:6-17, 314:21-22, 331:23-332:2, 728:23-732:14. But there was *no* evidence that Attwood or any other company ever actually *used* PowerTech's tool or propeller designs. Tr. 65:9-15 (testimony by Powers that all other companies use different tool designs); Tr. 122:12-16 (testimony by Powers that Attwood used different, inferior propeller design). In addition, Powers conceded that Attwood – like anyone else – could have obtained PowerTech's propellers for testing directly from a dealer. Tr. 244:7-10. Obtaining information by testing a publicly available product can never constitute trade secret theft. *Restatement (Third) of Unfair Competition* § 39 cmt. f (1995).

Not surprisingly, then, PowerTech did not follow through on its insinuations with evidence of any loss by it or profit by another resulting from misappropriation of its tool or propeller designs. PowerTech's damages witness on its trade secrets

claim was its expert Cummings, and he disavowed those theories. Tr. 606:7-8, 606:20-607:6. Without such proof, there can be no trade secret liability. *Restatement (Third) of Unfair Competition* § 45 (to obtain trade secret damages, plaintiff must show that misappropriation caused its own loss or another's gain).

Cummings opined about the amount of trade secret damages based on an entirely different theory: that Attwood entered the propeller market and competed against PowerTech. Tr. 606:2-3, 608:1-3 (R.E. Tab 23); *but see* Tr. 606:7-8 (R.E. Tab 23) (admission by Cummings that he was not opining that Attwood in fact stole any trade secrets). But again, there was *no* evidence, other than insinuations by PowerTech's counsel, that Attwood used any trade secret from PowerTech when deciding to enter the propeller market. To the contrary, in the very first communication between the parties, before Attwood obtained any information from PowerTech, Attwood disclosed its intention to enter that market:

> We plan on introducing a three-blade line of 13" to 14.5" diameter propellers this fall. Ultimately, we will offer a full range of all size propellers and blade configurations.

Pl.'s Exh. 1 (R.E. Tab 16). Later, when the parties were negotiating their supply arrangement, Powers himself acknowledged Attwood's plans to introduce its own "small prop line." Pl.'s Exh. 3 (R.E. Tab 17). There is no evidence that Attwood

misappropriated confidential information in carrying through a plan it had disclosed from the beginning.

Notwithstanding the complete absence of proof for this trade secrets theory, PowerTech's lawyers condemned Attwood simply for entering the market and competing against PowerTech. *E.g.,* Tr. 486:9-10 (question about impact on PowerTech from Attwood's "flooding of the market with [its own line of] Ballistic propellers"); Tr. 867:15-16 (question assuming that "going after PowerTech's business was unconscionable"); Tr. 1268:8-1269:9 (closing argument that Attwood's plan to compete was evidence of fraud).

Thus, PowerTech told the jury that PowerTech was entitled to damages simply because Attwood vigorously competed for a share of the market. Competition is the keystone of America's free-market system. Attwood disclosed its intention to compete from the start. There was no agreement between the parties to divide the market between them, leaving PowerTech free from competition in the small-propeller segment. And if there had been such an agreement, its lawfulness would be dubious at best. *Gainesville Utils. Dep't v. Florida Power & Light Co.*, 573 F.2d 292, 299 (5th Cir. 1978). PowerTech had no legal right to be free from Attwood's competition. Yet, it convinced the jury that

Attwood had done something wrong just by competing. That is no basis for trade secret liability, and it taints the rest of the jury's verdict.

## V. PowerTech Is Not Entitled to Punitive Damages.

### A. Michigan and Louisiana Law Apply and Bar Punitive Damages.

In a post-verdict but pre-judgment motion, Attwood demonstrated that Michigan or Louisiana law – not Texas law – governs the issues of punitive damages and attorneys' fees, that both kinds of awards are strictly prohibited by the public policies of those two states, and that those claims should therefore be dismissed. R. 1611-39; R. 1529-56; R. 291-326; R. 222-34. Finding Attwood's motion timely as to attorneys' fees, the court ruled that Michigan and Louisiana plainly have the "most significant relationship" to this dispute between a Louisiana plaintiff and a Michigan defendant for goods manufactured in Mexico, so that the law of those states applies under Texas choice-of-law principles. R. 283-87 (R.E. Tab 12).

On punitive damages, however, the court ruled that Attwood's motion was untimely because that claim had been submitted to the jury. R. 235-37 (R.E. Tab 13). There does not appear to be any dispute that PowerTech's punitive damages claim, like attorneys' fees, is governed by Michigan and/or Louisiana law. And both states have strong public policies against punitive damages. *E.g., Association*

*Research & Dev. Corp. v. CNA Fin. Corp.*, 333 N.W.2d 206, 210 (Mich. App. 1983) ("In Michigan, damages may not be awarded to punish the defendant"); *Popeyes, Inc. v. YCALWB, Inc.*, Civil No. A. 87-4041, 1988 WL 125458, at *4 (E.D. La. Nov. 21, 1988) ("Louisiana has a strong public policy against imposition of punitive damages"). Thus, there is no question that awarding PowerTech over $5 million in punitive damages is absolutely prohibited by law. The only question is whether the issue was raised too late.

**1. Attwood Timely Raised This Issue Before Judgment.**

Attwood timely raised this issue by bringing its motion *before judgment*. Which state's law applies is a pure question of law. *Minnesota Mining & Mfg. Co. v. Nishika Ltd.*, 955 S.W.2d 853, 856 (Tex. 1996). Similarly, that Michigan and Louisiana law both absolutely bar punitive damages for fraud and trade secrets claims is a pure question of law. Thus, with respect to punitive damages, PowerTech failed to state a claim for which relief could be granted. The prohibition against punitive damages is not dependent on some defect in proof or jury instructions, which might have been remedied had Attwood raised the choice-of-law issue earlier. No proof could entitle PowerTech to punitive damages, and no instruction could empower the jury to award them.

In this Circuit, a motion to dismiss for failure to state a claim is timely any time before judgment. *Madore v. Ingram Tank Ships, Inc.*, 732 F.2d 475, 479-80 (5th Cir. 1984). In *Madore*, plaintiff – like PowerTech here – argued that defendant "waived its right to object to [a] claim by failing to move to dismiss it *before or during trial on the merits.*" *Id.* at 479 (emphasis added). But this Court rejected that waiver argument:

> *Before judgment* [defendant] did file a memorandum in the district court denying that recovery might be had for such a claim. *This pre-judgment argument sufficed.*

*Id.* at 480 (emphasis added). *Madore* is directly on point. Attwood's "pre-judgment argument sufficed" to preserve its argument that PowerTech failed to state a claim for punitive damages under applicable law.

Attwood also preserved this argument through another route: it moved for judgment as a matter of law on PowerTech's punitive damages claim before the case was submitted to the jury. R. 1878-80, 1743. Although Attwood's pre-verdict motions did not specifically raise the choice-of-law argument,

> [w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). Thus, Attwood's pre-verdict Rule 50 motions were sufficient to preserve this alternative legal argument.

*See United States Nat'l Bank of Ore. v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993); *Texas Off. of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 440 n.86 (5th Cir. 1999), *cert. granted sub nom. GTE Servs. Corp. v. FCC*, 530 U.S. 1213, *cert. dismissed*, 121 S. Ct. 423 (2000).

### 2. In Any Event, Awarding Punitive Damages Constitutes Plain Error Here.

Even if Attwood had not timely raised its choice-of-law argument, the award of punitive damages in this case must be vacated as plain error. Plain error exists when there is (1) error that (2) is plain, (3) affects substantial rights, and (4) affects the fairness, integrity, or public reputation of judicial proceedings. *Oden v. Oktibbeha County*, 246 F.3d 458, 466 (5th Cir.), *cert. denied*, 534 U.S. 948 (2001). In *Oden*, this Court held that awarding punitive damages prohibited by law constitutes plain error. *Id.*; *see also Thompson v. Paasche*, 950 F.2d 306, 314-15 (6th Cir. 1991) (holding that awarding punitive damages barred by Michigan law is plain error); *Morganroth & Morganroth v. DeLorean*, 123 F.3d 374, 385-86 (6th Cir. 1997) (same); *Chestnut v. City of Lowell*, 305 F.3d 18, 20-21 (1st Cir. 2002) (en banc) (per curiam) (holding that awarding punitive damages barred by binding precedent is plain error).

The same is true here. (1) The punitive damages award is error: the issue is governed by Michigan and Louisiana law, which prohibit punitive damages.

(2) The error is "plain," which "is synonymous with 'clear' or, equivalently, 'obvious.'" *United States v. Olano*, 507 U.S. 725, 734 (1993); *see Crawford v. Falcon Drilling Co.*, 131 F.3d 1120, 1123 (5th Cir. 1997) (to be plain, error need *not* have been obvious when first made, but only when brought to court's attention). (3) The error affects substantial rights because it is prejudicial and affects the outcome of the case. *Crawford*, 131 F.3d at 1125. PowerTech was awarded millions of dollars in punitive damages that are barred by law. (4) Awarding punitive damages barred by law affects the fairness and integrity of judicial proceedings. *See Oden*, 246 F.3d at 466; *Paasche*, 950 F.2d at 314-15.

No doubt, it would have been the safest and wisest course for trial counsel to identify and raise the choice-of-law issue at the earliest point. Nonetheless, as explained above, the issue was timely raised. And even if it were not, penalizing Attwood, and rewarding PowerTech, with a $5 million windfall would still be fundamentally unfair.

PowerTech is a Louisiana plaintiff that sued a Michigan defendant in connection with an alleged contract performed at a foundry in Mexico. Yet, PowerTech decided to exploit Attwood's minimum contacts with Texas in order to sue it there. PowerTech's forum-shopping should not be rewarded with a punitive damages award under Texas law, when Texas law does not apply and Michigan

and Louisiana have strong public policies against this kind of punishment. The punitive damages must be vacated.

**B. The Punitive Damages Are Also Improper Under Texas Law.**

Even under Texas law, PowerTech is not entitled to punitive damages. In its drive for punitive damages, PowerTech has tried to convert a claim for breach of an (unenforceable) contract into one for fraud and theft of trade secrets. As demonstrated above, those claims are meritless. *A fortiori*, PowerTech has failed to establish its fraud and trade secrets claims with *clear and convincing evidence*, as required for punitive damages. Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a).

PowerTech also could not establish *malice* by clear and convincing evidence, as required for punitive damages. *Id.* Its purported evidence of malice was actually irrelevant to that issue and instead served to inflame the jury's passions and prejudices. To take the most glaring example, Morrow's testimony about Rocheleau's vulgar statement, "'Fuck 'em . . . That's why Steelcase has lawyers on retainer, to handle assholes like that," Tr. 326:11-14, was repeatedly cited by PowerTech's lawyers as evidence of malice and, indeed, as grounds for finding against Attwood on "everyone [sic] of these liability issues," Tr. 1310:1-13; *see supra* at 17. But Rocheleau's statement was made *after* announcing that the Reynosa foundry would close. Tr. 326:15-22. His words could not be

evidence of malice in connection with the *earlier* representations and non-disclosures on which PowerTech based its fraud claim. Rocheleau's statement was irrelevant, but highly prejudicial.

In addition, the punitive damages must be vacated because the actual compensatory damages proved at trial (assuming liability) are at most $30,521. *Supra* Point III. The punitive damages award is more than 169 times those actual damages – rather than the doubled damages intended by the jury. Under these circumstances, the punitive damages are plainly excessive. *Quest Med., Inc. v. Apprill*, 90 F.3d 1080, 1083-85, 1089-91 (5th Cir. 1996); *Natco, Inc. v. Williams Bros. Eng'g Co.*, 489 F.2d 639, 640-41 (5th Cir. 1974); *see also State Farm Mut. Auto Ins. Co. v. Campbell*, 123 S. Ct. 1513, 1524 (2003) ("few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process"). Indeed, this Court's precedent requires vacatur of the entire grossly disproportionate damages award and a new trial, since the inflated award must be attributable to impermissible passion. *Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679, 684 (5th Cir. 1986).

## VI. Alternatively, Attwood Is Entitled to a New Trial.

For the reasons above, the Court should direct entry of judgment for Attwood on all claims or, if PowerTech's contract claim survives, remittitur of

damages exceeding $30,521. To the extent the Court does not do so, however, Attwood is entitled to a new trial.

The district court denied Attwood's motion for a new trial "without prejudice" to allow this Court to consider the issue in the first instance. R. 35 (R.E. Tab 14) (citing *Neely v. Martin K. Eby Construction Co.*, 386 U.S. 317, 324 (1967); Fed. R. Civ. P. 50(c), (d)). Although *Neely* concerned a somewhat different procedural posture (a conditional motion for new trial by the prevailing party), *Neely* confirms that this Court has the jurisdiction and authority to rule on *any* new trial motion not previously adjudicated by the trial court. 386 U.S. at 327-30. Therefore, in the interest of judicial economy, this Court should rule on Attwood's new trial motion in the first instance, applying the same standard normally applied in the district court.

A new trial is appropriate under two circumstances directly relevant here: when "the jury verdict results from passion or prejudice," *Westbrook v. General Tire & Rubber Co.*, 754 F.2d 1233, 1241 (5th Cir. 1985), or when "the verdict is against the clear weight of the evidence," *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 957 (5th Cir. 1981). The "weight of the evidence" standard for a new trial is a lower hurdle than the "insufficient evidence" standard for judgment as a matter of law; in addition, a new trial is the proper remedy for insufficient evidence

if the right to judgment as a matter of law is waived. *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 269 n.2, 271 (5th Cir. 1998).

Here, the verdict "result[ed] from passion or prejudice" *and* "is against the clear weight of the evidence." These two defects are related. The jury reached a verdict contrary to the evidence precisely because of counsel's misconduct in appealing to passion and prejudice.

From the beginning to the end of the trial, PowerTech improperly framed this case in terms of the relative sizes of the parties – contrary to the district court's rulings on motions in limine – and gratuitously injected irrelevant family connections. *Supra* at 13-19. That alone is grounds for a new trial. *Whitehead*, 163 F.3d at 276 (ordering new trial where plaintiff's counsel repeatedly reminded jury that defendant was "national corporation"); *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 283-84 (5th Cir. 1975) (holding that counsel's appeal to jury by virtue of his personal relation to party "so far exceeded proper bounds and was so conducive to prejudicing the jury's verdict that it substantially affected the total fairness of the trial"); *Adams Lab, Inc. v. Jacobs Eng'g Co.*, 761 F.2d 1218, 1226 (7th Cir. 1985) ("If the wealth and size of a corporation are not at issue, counsel is bound to refrain from making reference to such size and wealth, or bear the risk of an unfavorable appellate reception") (quotation marks omitted); *City of Cleveland*

*v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 757-58 (6th Cir. 1980) (ordering new trial because references to defendants' size deprived defendant of fair trial); *Ballinari v. Clark Equip. Co.*, 841 F. Supp. 662, 666-67 (E.D. Pa. 1993) (granting new trial on basis of allusions to defendants' size), *aff'd*, 96 F.3d 1431 (3d Cir. 1996) (unpublished table decision).

PowerTech's lawyers also repeatedly condemned Attwood for seeking advice of counsel and asserting its legal rights. Again and again counsel came back to the fact that Attwood had raised a statute of fraud defense; counsel repeated Morrow's testimony that Rocheleau (vulgarly) said the company had lawyers to deal with PowerTech if it sued; counsel even misled the jury concerning Attwood's handling of an employee dispute that had no arguable relevance to this case. *Supra* at 18-19. Based on Attwood's intent to vigorously defend this suit with its own counsel, PowerTech's lawyers argued that Attwood should be found liable on every claim. Tr. 1310:1-13. In reality, Attwood was simply exercising its "constitutionally guaranteed right to retain hired counsel in civil matters." *Texas Catastrophe Prop. Ins. Ass'n v. Morales*, 975 F.2d 1178, 1180 (5th Cir. 1992); *accord Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1104 (5th Cir. 1980).

In its argument for punitive damages, PowerTech's counsel made a blatant appeal to jurors to view the case in emotional terms, compared Attwood to criminal

defendants, and cited the Bible as a standard for punitive damages. *Supra* at 19. Courts consistently require new trials for comparisons between civil parties and criminals, even when the comparison is far more subtle than that here, and even when a curative instruction is given. *See, e.g., Koufakis v. Carvel*, 425 F.2d 892, 900-01 (2d Cir. 1970); *Theriot v. Mercer*, 262 F.2d 754, 758 (5th Cir. 1959); *Drasner v. Thomson McKinnon Secs., Inc.*, 433 F. Supp. 485, 489-90 (S.D.N.Y. 1977); *see also Hall v. Freese*, 735 F.2d 956, 960-61 (5th Cir. 1984). Appeals to the Bible are also highly prejudicial and improper and constitute grounds for a new trial. *E.g., Schleunes v. American Cas. Co.*, 528 F.2d 634, 638 (5th Cir. 1976); *Atlantic Coast Line R.R. Co. v. Kammerer*, 218 F.2d 149, 153 (5th Cir. 1955); *Theriot*, 262 F.2d at 758; *Cunningham v. Zant*, 928 F.2d 1006, 1019-20 (11th Cir. 1991).

Even considered in isolation, these appeals to passion and prejudice warrant a new trial. But they should not be viewed in isolation. Where the evidence is at best weak or the record shows substantial misconduct by plaintiff's counsel, this Court will carefully examine the record and the *cumulative effect* of the misconduct and evidentiary deficiencies in ordering new trials. *Whitehead*, 163 F.3d at 275-79; *Hall*, 735 F.2d at 959-62. As the Court explained in ordering a new trial in *Whitehead*:

> Of course, we need not find that each statement, taken individually, was so improper as to warrant a new trial. Rather, taken as a whole, these comments prejudiced the jury's findings with respect to damages. . . . That the awards were improperly influenced by passion and prejudice is indicated by their size. Without deciding that the awards were excessive, we note that, at the very least, they are at the high end of the spectrum for such damages. The large verdict, when accompanied by counsel's improper arguments, further indicates that the jury was influenced by the prejudicial statements.

163 F.3d at 278. Precisely the same is true here.

## CONCLUSION

For the foregoing reasons, the judgment should be reversed and the Court should direct entry of judgment for Attwood on all claims or, if PowerTech's contract claim survives, remittitur of damages exceeding $30,521. In the alternative, the judgment should be reversed and the case should be remanded for a new trial.

Respectfully submitted,

David W. DeBruin
William M. Hohengarten
David Fagundes
JENNER & BLOCK, LLC
601 13th Street, N.W.
Washington, D.C. 20005-3823
Tel: (202) 639-6000
Fax: (202) 639-6066
*Counsel for Attwood Corporation*

August 18, 2003

## CERTIFICATE OF SERVICE

I hereby certify that I have this 18th day of August, 2003, served both paper and electronic copies of the foregoing Opening Brief of Defendant-Appellant-Cross-Appellee upon the following, attorney of record for Plaintiff-Appellee-Cross-Appellant Propulsion Technologies Inc., by Federal Express postage pre-paid:

K.B. Battaglini
Shook, Hardy & Bacon
600 Travis Street
Suite 1600
Houston, TX 77002-2911

David W. DeBruin
*Attorney of Record for Attwood Corporation*

## CERTIFICATE OF COMPLIANCE

Pursuant to FRAP 32(a)(7)(C), I hereby certify that the foregoing Opening Brief of Defendant-Appellant-Cross-Appellee complies with the type-volume limitation of FRAP 32(a)(7)(B). The brief is printed in Times New Roman font in 14 point typeface. As counted by Corel WordPerfect 9, the brief contains 1279 lines.

David W. DeBruin
*Attorney of Record for Attwood Corporation*

## ARGUMENT

### I. The U.C.C. Statute of Frauds Bars PowerTech's Contract and Fraud Claims.

The district court erroneously held that the parties' alleged agreement is predominantly for the provision of services, not goods, rendering the U.C.C. statute of frauds inapplicable. The court made this ruling as a matter of law; it was not submitted to the jury. Tr. 753:12-754:25 (R.E. Tab 8); Tr.1237:17-1238:6 (R.E. Tab 11); R. 8-9. It is a question of law reviewable by this Court *de novo*. *Continental Casing Corp. v. Siderca Corp.*, 38 S.W.3d 782, 787-88 (Tex. App. 2001).[5]

#### A. The U.C.C. Applies.

The parties' arrangement for the sale of propellers, which Attwood specially manufactured using PowerTech's tooling, is plainly predominantly for the sale of goods, not services. This kind of supply arrangement lies in the heartland of U.C.C. Article 2, which applies to transactions in "goods." Tex. Bus. & Com. Code Ann. § 2.102. "Goods" are defined as "all things (including *specially manufactured goods*) which are *moveable*." *Id.* § 2.105 (emphasis added). The

---

5/ Texas has only a minimal relationship to this case, not the "most substantial relationship." *See infra* Point V. Therefore, where a conflict between the law of Texas and the state(s) with the "most substantial relationship" exists, the law of the latter applies. *Id.* As the district court observed, however, Texas forum law is properly applied *where no party brings a conflict of law to the court's attention*. R. 285-286 (R.E. Tab 19). Since conflicts of law have been shown only for attorneys' fees and punitive damages, Texas law is properly cited for all other issues.

propellers here are quintessentially "moveable" "things." And the U.C.C. expressly covers "specially manufactured goods" like these.

In reaching the contrary conclusion, the district court said the arrangement "was for the furnishing of services that included both labor and material, rather than an emphasis on passing the title to goods." R. 9 (R.E. Tab 14). But that logic would apply to *every* supply arrangement between a manufacturer – who *always* "furnish[es] . . . labor and material" to create finished goods – and buyers. Such a result is plainly absurd. It would also eviscerate the U.C.C.'s explicit inclusion of "specially manufactured goods" in its definition of goods – a result forbidden by basic rules of statutory construction. *Texaco, Inc. v. Duhe*, 274 F.3d 911, 920 (5th Cir. 2001) (noting "cardinal rule of statutory construction that every word has some operative effect") (citation, quotation marks omitted).

Not surprisingly, then, the district court's result is directly contrary to that reached by this and other courts. When one party manufactures and sells goods according to the instructions of the customer, it is a transaction in "goods" covered by the U.C.C., notwithstanding the incidental provision of services in every act of manufacturing. For example, in *Crest Ridge Construction Group, Inc. v. Newcourt, Inc.*, 78 F.3d 146 (5th Cir. 1996), this Court held that the U.C.C. governed an agreement by a wall-paneling supplier to specially manufacture and

supply wall panels for a subcontractor. *Id.* at 148, 150 ("Wall panels are 'things . . . which are movable at the time of identification to the contract for sale' and are thus considered 'goods'"); *accord Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 194-95, 197 (Tex. App. 1992) (holding that contract for special manufacture and sale of water-treatment equipment was "predominantly for the supply of equipment" and that "[a]ccordingly, the UCC applies to this transaction"); *Stewart & Stevenson Servs., Inc. v. Enserve, Inc.*, 719 S.W.2d 337, 339, 341 (Tex. App. 1986) (applying U.C.C. to contract for manufacture and sale of oil well-servicing pumps); *Custom Controls Co. v. Ranger Ins.*, 652 S.W.2d 449, 450-52 (Tex. App. 1983) (applying U.C.C. to contract for "12 wellhead control panels that were to be specifically designed and constructed to meet the particular needs of" buyer); *Jay V. Zimmerman Co. v. General Mills Inc.*, 327 F. Supp. 1198, 1200, 1203 (E.D. Mo. 1971) (applying U.C.C. to contract to produce two molds for plastics).

*Freeman v. Shannon Construction, Inc.*, 560 S.W.2d 732, 737 (Tex. Civ. App. 1977), cited by the district court, is wholly inapposite. *Freeman* held that a *building* construction contract was not a transaction in goods under the U.C.C. *Id.* at 733-34. But that was because the product in *Freeman* was *real property*, not "movable" things. Because the concrete structure of an apartment building –

unlike a propeller – is not moveable, the U.C.C. did not apply. For the same reason, *Freeman*'s discussion whether the contract there was predominantly for furnishing *raw materials* is inapposite here. Attwood has never argued that it was selling raw materials to PowerTech. It was selling cast propellers, which – unlike an apartment building – are themselves moveable goods.

### B. The U.C.C. Bars PowerTech's Contract and Fraud Claims.

The U.C.C. bars enforcement of an alleged contract without a *written* quantity term. Tex. Bus. & Com. Code Ann. § 2.201. This prerequisite can be satisfied by a *written* specification that a buyer will buy its "requirements" from the seller. *Id.* § 2.306. However,

> [a]n essential element of a requirements contract is the promise of the buyer to purchase *exclusively* from the seller either the buyer's entire requirements or up to a specified amount. . . . Without such a promise by the buyer, a requirements contract *fails for lack of consideration*. . . .
>
> . . . While the quantity term in requirements contracts need not be numerically stated, *there must be some writing* which indicates that the quantity to be delivered under the contract is the party's requirements or output.

*Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 963 (5th Cir. 1999) (emphasis added); *accord Mid-South Packers, Inc. v. Shoney's, Inc.*, 761 F.2d 1117, 1120-21 (5th Cir. 1985).

The parties' January 28 letter, Pl.'s Exh. 19 (R.E. Tab 19), fails this test. As Powers admitted, the letter contains neither a written quantity term nor a written commitment by PowerTech to buy its requirements exclusively from Attwood. Tr. 250:10-21, 287:19-288:13 (R.E. Tab 22). Powers's self-serving testimony that the parties intended a requirements contract, *id.*, cannot supply the missing quantity term. The statute of frauds exists precisely to prevent the party *seeking to enforce* an alleged contract from obtaining damages based on an alleged oral agreement. Where there is no written quantity term, it can be supplied only by the judicial admission of "the party *against whom* enforcement is sought." Tex. Bus. & Com. Code Ann. § 2.201(c)(2) (emphasis added). And Rocheleau testified for Attwood that PowerTech was free to buy its requirements from other suppliers. Tr. 780:13-781:9 (R.E. Tab 24). Accordingly, there was no enforceable contract.

That is no mere technicality. Under the January 28 letter – which simply reiterates terms dictated *by PowerTech*, *see* Pl.'s Exh. 3 (R.E. Tab 17) – PowerTech was legally free to take its business elsewhere at any time. Hence, the alleged contract "fails for lack of consideration." *Merritt-Campbell*, 164 F.3d at 963. PowerTech should not, and cannot, recover $2,582,670 in contract damages under an arrangement whereby PowerTech made no commitment whatsoever to Attwood.

Nor can PowerTech circumvent the statute of frauds – and seek punitive damages to boot – by pleading a fraudulent inducement claim. "Fraudulent inducement" – the only kind of fraud for which PowerTech sued, R. 4913-15 – "is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof." *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001). Thus, "the Statute of Frauds bars a fraud claim to the extent the plaintiff seeks to recover as damages the benefit of a bargain that cannot otherwise be enforced because it fails to comply with the Statute of Frauds." *Id.* at 799. As the district court ruled in setting aside PowerTech's negligent misrepresentation claim, PowerTech's tort damages duplicate its contract damages. R. 28-30 (R.E. Tab 14). They are therefore for the benefit of an unenforceable bargain. PowerTech cannot circumvent the statute of frauds in this way. The U.C.C. bars its contract and fraud claims.

## II. PowerTech's Fraud Claim Is Unsupported by Evidence of Any Misrepresentation by Attwood.

PowerTech's fraud claim fails for another, equally compelling reason: there simply is no evidence of any misrepresentation by Attwood. This is the classic example of overreaching by a plaintiff that attempts to convert a contract dispute into a case of fraud in order to seek a punitive damages award. The fact that here the alleged contract is unenforceable under the statute of frauds does not

undermine that point, but reinforces it. As explained above, PowerTech cannot circumvent the statute of frauds by claiming that it was fraudulently induced to enter into an unenforceable agreement. Nonethless, PowerTech argued to the jury that Attwood's statute of frauds defense was itself somehow evidence of wrongful or fraudulent conduct. *Supra* at 16; Tr. 20:13-21:4, 1263:25-1264:7. This was part of an ongoing effort by PowerTech's attorneys to create an atmosphere of wrongfulness on the part of Attwood, rather than actually proving fraud.

In this case the fraud verdict rests on the preliminary question whether any "partial truth" by Attwood gave rise to a duty to disclose additional information. "Whether such a duty exists [under a partial truth theory] is a question of law." *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). Thus, whether the record supports a duty to disclose is reviewed by this Court *de novo*.

The subsidiary question whether the evidence supports the finding of an affirmative misrepresentation – or, if a duty to disclose exists, supports the finding of a misleading nondisclosure – is reviewed under the sufficiency of the evidence standard. Under that standard, a jury verdict must be set aside

> not only when the [appellee] presents no evidence, but also when there is not a sufficient conflict in substantial evidence to create a jury question. Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions.

*Scott v. Univ. of Miss.*, 148 F.3d 493, 504 (5th Cir. 1998) (quotation marks, citations omitted), *abrogated in part on other grounds*, *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000). The evidence is viewed in the light most favorable to the verdict. 148 F.3d at 504. This Court reviews the district court's application of this legal standard *de novo*. *Id.* at 503.

### A. Attwood Is Not Liable on a "Partial Truth" Theory.

It is indisputable that Attwood made no affirmative misrepresentation about the financial condition of the Reynosa foundry. Indeed, Powers admitted that he never asked about the foundry's financial condition and that he only had the "impression" that it was profitable because nothing bad was ever said about its finances. Tr. 266:11-15, 111:9-14 (R.E. Tab 22). Thus, PowerTech struggled to develop a theory of fraud based on a duty to disclose. Its primary theory was that Attwood had a *fiduciary obligation* to disclose financial information. But the district court rejected that, because this case involves the quintessential arms-length relationship of vendor to purchaser. Tr. 752:3-24 (R.E. Tab 8). "[M]ere subjective trust does not, as a matter of law, transform arm's-length dealing into a fiduciary relationship." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997).

PowerTech then recast its duty-to-disclose theory as resting on purported "partial truths" told by Attwood, and the district court instructed the jury on that theory. R. 1677. Attwood has consistently objected to the partial truth theory on the law and the evidence. Tr. 1238:17-20; R. 1812-14; R. 1869-71; R. 181-83.

A party has no duty to disclose its financial condition to its bargaining partner, even when its finances are material to the other party's decision to enter into a transaction or when financial problems could prevent performance. *Stephanz v. Laird*, 846 S.W.2d 895, 904 (Tex. App. 1993); *Moore & Moore Drilling Co. v. White*, 345 S.W.2d 550, 555 (Tex. Civ. App. 1961). As the district court itself recognized, this fundamental rule reflects "common sense," because requiring companies – particularly those, like the Reynosa foundry, that are starting up and struggling to succeed – to disclose every potential risk would be "self-defeating." Tr. 895:10, 895:18 (R.E. Tab 9).

As the Texas Supreme Court recently explained, some *other* courts have followed *Restatement (Second) of Torts* § 551 by holding that "a general duty to disclose information may arise in an arm's-length business transaction when a party makes a partial disclosure that, although true, conveys a false impression." *Bradford*, 48 S.W.3d at 755. But the Texas Supreme Court itself "ha[s] never adopted section 551." *Id.* at 756; *accord Coburn Supply Co. v. Kohler Co.*, __ F.3d

__, No. 02-41317, 2003 WL 21802016, at *5 (5th Cir. Aug. 6, 2003). Moreover, even if a "partial truth" theory sometimes has validity, whether any affirmative statements by Attwood gave rise to a duty to disclose on that theory is a question of law for the court. *Bradford*, 48 S.W.2d at 755.[6]

Here, the theory must be rejected as a matter of law. If Attwood's utterances created a duty to disclose all confidential information about the profitability of its foundry, then such a duty exists in every case. The exception would swallow the well-established rule that parties to arms-length transactions have no duty to disclose.

PowerTech tried to create a duty to disclose confidential financial information based on generalized statements that the Reynosa foundry was a "wonderful facility," "successful," and "state-of-the-art." Tr. 91:19-20, 92:16 (R.E. Tab 22). In context, these statements were about the technical capabilities of the foundry – its ability to produce the highest quality castings in large quantities – and they were indisputably true. As Powers admitted, the foundry was "the Taj

---

6/ Before the Texas Supreme Court's recent decision in *Bradford*, this Court upheld a "partial truth" fraud theory where there was a very close nexus between the partial disclosure and the undisclosed facts. *See Trustees of the NW Laundry & Dry Cleaners Health & Welfare Trust Fund v. Burzynski*, 27 F.3d 153, 157 (5th Cir. 1994). Assuming that *Burzynski* survives *Bradford*, its rationale should not be expanded to cases where there is no such nexus, or every arms-length transaction will require full disclosure of every material risk.

Mahal of casting facilities" and produced castings of "very good" quality. Tr. 108:24-25, 135:8-10, 267:10-11 (R.E. Tab 22).

Moreover, words like "wonderful" and "successful" are inherently too vague to support fraud liability – much less give rise to a duty to disclose unrelated confidential information. For example, a seller's representation that a building was "superb," "super fine," and "one of the finest little properties in the City of Austin" – even though the building contained asbestos – "were not misrepresentations of material fact but merely 'puffing' or opinion, and thus could not constitute fraud." *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 163 (Tex. 1995).

PowerTech also contended that a duty to disclose arose from a letter – written after the parties entered into their arrangement – concerning Attwood's efforts to meet PowerTech's lead times. By April 1996, the parties had agreed to the terms on which they would do business and Attwood had begun selling specially manufactured propellers to PowerTech. Tr. 114:1-6; Pl.'s Exhs. 4, 6, 8, 10. Three months later, in July, Rocheleau wrote:

> Kemper [Morrow] will give you a schedule on when your orders will be current and future lead times. Business is picking up for us. The foundry is hiring new employees and it will take time to train them. We realize we are the ones who wanted the tools right away and I've told Kemper your orders take priority over everyone else . . . .

Pl.'s Exh. 15 (R.E. Tab 18).

According to PowerTech, the statements that "[b]usiness is picking up" and "[t]he foundry is hiring new employees" gave rise to a duty to disclose *all* material financial information and risks – ultimately resulting in $8 million in compensatory and punitive damages. That unprecedented expansion of the "partial truth" theory must be rejected. The subject matter addressed in the quoted paragraph is Attwood's effort to fill PowerTech's orders, which brought new business to Reynosa. The foundry hired new employees to fill the orders, but it would take time to train them; thus, Attwood made special arrangements – priority for PowerTech's orders – to meet lead-time requirements in the interim.

None of these statements was shown to be false, and none concerned the financial condition of the foundry. To the extent they brushed up against that topic, they confirmed the fact – which was already obvious from Attwood's solicitation of PowerTech's business – that the foundry was underutilized. Finally, the statements were made *after* PowerTech and Attwood had already agreed on the terms under which they would do business, *see* Pl.'s Exhs. 4, 6, 8, 10, which were merely restated in the January 28 letter, Pl.'s Exh. 19 (R.E. Tab 19).

This kind of incidental statement about efforts to perform an arms-length transaction cannot give rise to a general duty to disclose all material risks of non-

performance. Such a rule would impose fiduciary disclosure obligations. As a matter of law, *see Bradford*, 48 S.W.3d at 755, no duty to disclose could have arisen from the statements here. The "partial truth" theory should not have been submitted to the jury, and the fraud verdict cannot be upheld under that theory.

### B. Fraud Cannot Be Based on Attwood's Statement that It Intended a "Long-Term" Relationship.

Nor can the fraud verdict be based on Attwood's statements that it intended to enter a "long-term" relationship. Like "wonderful" and "successful," "long-term" is an inherently vague phrase for which no fraud claim can lie. Indeed, Powers admitted that he attached completely different meanings to "long-term" in PowerTech's letter agreement with Attwood and PowerTech's essentially identical letter agreement with Michigan Wheel. Tr. 275:1-277:17 (R.E. Tab 22); *compare* Pl.'s Exh. 19 (R.E. Tab 19) *with* Def.'s Exh. 75 (R.E. Tab 21).

Here, moreover, the meaning of "long-term" was limited by a clause expressly recognizing the parties' right to terminate their arrangement on 12 months' notice. Pl.'s Exh. 19 (R.E. Tab 19). Thus, PowerTech could not reasonably have relied on "long-term" to mean that the relationship would last *more* than a year. And, in fact, Attwood supplied PowerTech for *two years*, from April 1996 through at least April 1998. Tr. 114:1-6, 199:3-5. Thus, even

assuming that the January 28 letter was an enforceable contract, where parties have negotiated for an express right to terminate, a fraud claim cannot rest on the expectancy that their relationship will nonetheless continue for a longer period. *See Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 665 (Tex. 1990); *Fisher Controls Int'l, Inc. v. Gibbons*, 911 S.W.2d 135, 141-42 (Tex. App. 1995).

Most importantly, there is simply *no* evidence that Attwood's stated intent to enter a "long-term" relationship was false. A promise to do an act in the future is fraudulent only "when made with the intention, design, and purpose of deceiving and with no intention of performing the act." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). The district court thought this standard was satisfied by evidence that Attwood knew the Reynosa foundry's "future was *uncertain* and it was experiencing financial difficulties" and that Attwood *later* terminated the arrangement. R. 25 (R.E. Tab 14) (emphasis added). But that is not evidence of an affirmative present intention not to perform. It only shows that Attwood knew of a *risk* that *might* prevent performance.

Again, if this theory were accepted, every act of contracting would impose sweeping disclosure requirements. The district court reasoned that the jury could find Attwood's stated intent to be false when stated, merely because Attwood knew

of a *risk* that *might* prevent it from performing, and that risk came to fruition. Since every contract is a promise to perform, any time a risk known to one party but not disclosed to the other prevents the first party from performing, fraud would exist on the district court's theory.

Thus, this theory, like the "partial truth" theory, is just another version of PowerTech's position that Attwood was somehow required to disclose the financial condition of the foundry because it posed a risk of non-performance. If fraud exists here, then it exists in every contract case where there is an undisclosed risk at the time of contracting. Courts firmly reject such efforts to convert garden-variety contract breaches into fraud. *E.g., Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995) (rejecting "logic [that] would convert every breach of contract into a tort claim"); *CBI NA-CON, Inc. v. UOP, Inc.*, 961 S.W.2d 336, 341 (Tex. App. 1997) ("Every breach of contract should not become a tort action.").

Despite its efforts to portray itself as a "little bitty" company tricked by a "thousand-pound gorilla," PowerTech is a successful business with annual sales in the millions of dollars. Tr. 516:11-14. It cannot recover $8 million in compensatory and punitive damages for fraud on the theory that Attwood failed to disclose confidential financial information about which Powers never even bothered to ask.

## III. PowerTech's Contract and Fraud Damages Are Unsupported by Evidence.

The record also does not support the compensatory damages award of $2,582,670, even assuming that the parties entered into an enforceable contract. The jury's acceptance of PowerTech's outlandish damages claim is another indication that this case was tried on passion, not evidence. This issue is reviewed under the sufficiency of the evidence standard. *Supra* at 36-37.

Contract damages are recoverable only for losses that are foreseeably *caused* by a party's *breach* of contract. *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 688 (Tex. 1981); *Prudential Secs., Inc. v. Haugland*, 973 S.W.2d 394, 397 (Tex. App. 1998) ("The absence of [a] causal connection between the alleged breach and the alleged damages will preclude recovery"). Stated another way, PowerTech may only recover damages placing it "as nearly as possible in the position that [it] would have occupied had [Attwood] performed the contract." *Coughlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 453-54 (5th Cir. 2001).

Fraud damages are similarly limited. Damages for fraudulent inducement are limited to the "benefit of the bargain," which "only compensates for the profits that would have been made had the bargain been performed as promised." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49-50 (Tex. 1998); *accord Hart v. Moore*, 952 S.W.2d 90, 97 (Tex. App. 1997)

("the theories of recovery for both tortious misrepresentation and breach of contract are similar and necessarily involve the same type of damages"); *Coughlan*, 240 F.3d at 453. Thus, like contract damages, fraud damages *cannot* be based "on an entirely hypothetical, speculative bargain that was never struck and would not have been consummated." *Formosa*, 960 S.W.2d at 50.[7]

Assuming the parties had an enforceable contract, Attwood breached it when it stopped supplying PowerTech less than 12 months after giving notice of termination. PowerTech could recover contract and fraud damages only up to the benefit of the bargain, placing PowerTech in the same position as if Attwood had supplied it for the entire 12-month period. *But PowerTech had no right to any further performance from Attwood after that point.* PowerTech did not have a permanent right to be supplied by Attwood's state-of-the-art foundry. And it does not have a right to damages for *termination* of the supply arrangement – in contrast to its breach by short notice. *See Juliette Fowler*, 793 S.W.2d at 665; *Nelson Cash Register, Inc. v. Data Terminal Sys., Inc.*, 671 S.W.2d 594, 601 (Tex. App. 1984) (reversing damages for loss "caused by the cancellation of the . . . contract rather than by its breach").

---

7/ A fraud plaintiff may recover "out-of-pocket" losses instead of "benefit-of-the-bargain" damages – but not both. *Coughlan*, 240 F.3d at 453. As the district court ruled in connection with PowerTech's negligent misrepresentation claim, all damages here were predicated on a benefit-of-the-bargain theory. R. 29-30.

Yet, PowerTech sought and obtained damages on the assumption that it was entitled to be supplied by Attwood into the indefinite future, not just during the 12-month notice period. Those "damages" fall into three categories.[8]

First, PowerTech obtained $360,896 in "cover" reflecting the difference in the price for propellers and related benefits under its arrangement with Attwood compared to its arrangements with alternative suppliers – most of which accrued *after* the 12-month notice period. *Supra* at 11. But PowerTech had no legal right to obtain propellers on the terms negotiated with Attwood after the notice period ended. Hence, Attwood is not liable for the higher prices paid by PowerTech thereafter. Attwood's expert determined that, *when properly limited to the notice period*, damages for cover amount to $24,646. Tr. 1174:24. That is the only probative evidence in the record on this issue. In addition, Attwood does not contest $5,875 in warranty damages, *see* Pl.'s Exh. 255 (R.E. Tab 20), for total damages in this category of $30,521.

Second, PowerTech obtained $600,328 in damages for the entire cost of constructing its own foundry. *Supra* at 20. It is self-evident that PowerTech's capital investments in its own foundry are not losses caused by a breach of contract. Powers testified that he always planned to build his own foundry if

---

8/ A more detailed discussion of the evidence is found at R. 170-79.

Attwood gave notice of termination – which Attwood had a right to do. Tr. 266:16-267:3 (R.E. Tab 22), 612:14-15. Nor can Attwood be held liable for the *entire cost* of building a new foundry on the theory that Attwood's short notice caused PowerTech to build a substandard facility. Powers testified that "[t]he only real problems we have with the current foundry is its efficiency is not what it is supposed to be." Tr. 269:15-17. PowerTech continues to use the foundry and turn a comfortable profit today. Tr. 516:11-14; 817:6-7. Plainly, the foundry is not *worthless*. Yet PowerTech wants Attwood to pay its *entire cost*, not just damages for defects. Nothing in the parties' arrangement entitled PowerTech to a *free* foundry if Attwood terminated.

Third, PowerTech claims $1,440,571 in alleged lost profits for the *five years after termination*. *Supra* at 21. Applying the principle that contract damages must be *caused* by *breach*, courts have held that lost profits for early termination of a contract must be limited to profits *during the notice period*. *Osborn v. Commanche Cattle Indus., Inc.*, 545 P.2d 827, 831-32 (Okla. App. 1975); *Machine Maint. & Equip. Co. v. Cooper Indus., Inc.*, 634 F. Supp. 367, 371 (E.D. Mo. 1986); *Sierra Wine & Liquor Co. v. Heublein, Inc.*, 626 F.2d 129, 132 (9th Cir. 1980).